IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

**LUCAS ALZU**,

        Petitioner,

vs.

**AMY NICHOLE HUFF**,

        Respondent.

Case No.: 23-cv-3022-MDH

Hon. M. Douglas Harpool

---

**RESPONDENT'S PRE-HEARING BRIEF ON HABITUAL RESIDENCE**

---

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*New York ex rel. B.E. v. T.C.*,
   164 N.Y.S.3d 374 (N.Y. Sup. Ct. 2022) .................................................................................12

*Barzilay v. Barzilay*,
   600 F.3d 912 (8th Cir. 2010) ....................................................................................................9

*Delvoye v. Lee*,
   224 F. Supp. 2d 843 (D.N.J. 2002), *aff'd*, 329 F.3d 330 (3d Cir. 2003)..................................10

*Monasky v. Taglieri*,
   589 U.S. 68 (2020)............................................................................................................. *passim*

*Nisbet v. Bridger*,
   2023 WL 6998081 (D. Or. Oct. 24, 2024), *appeal filed*, No. 23-3877 (9th Cir.
   Nov. 30, 2023) .............................................................................................................11, 12, 13

*Ohlander v. Larson*,
   114 F.3d 1531 (10th Cir. 1997) ..............................................................................................14

*Pope v. Lunday*,
   835 F. App'x 968 (10th Cir. 2020) .........................................................................................15

*Silverman v. Silverman*,
   338 F.3d 886 (8th Cir. 2003) ..................................................................................................11

*Sain ex rel. V.R.S. v. Sain*,
   548 F. Supp. 3d 1181 (M.D. Fla. 2021) .............................................................................11, 12

*Tsuruta v. Tsuruta*,
   76 F.4th 1107 (8th Cir. 2023) .................................................................................................13

*Watts v. Watts*,
   935 F.3d 1138 (10th Cir. 2019) ..............................................................................................15

**Statutes & Regulations**

22 U.S.C. § 9001...............................................................................................................................9

22 U.S.C. § 9003...............................................................................................................................9

51 Fed. Reg. 10494 (Dep't of State Mar. 26, 1986) ...................................................................9, 14

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................................................................................................1

FACTUAL BACKGROUND ......................................................................................................2

    A.    The Parties Met Traveling in Colombia and Planned to Travel with the Child.................................................................................................................. 3

    B.    Ms. Huff Returned Home, and Petitioner Begrudgingly Went to Argentina To Try To Obtain a U.S. Visa, but Convinced Ms. Huff to Come for the Birth ........................................................................................... 4

    C.    The COVID-19 Pandemic Prevented Anyone from Leaving Argentina ................ 6

    D.    Ms. Huff and the Child were Trapped in Argentina During COVID-19................ 6

    E.    Six Weeks After Borders Opened Ms. Huff and the Child Traveled to Missouri ................................................................................................................. 8

    F.    Petitioner is in Argentina Because of this Litigation and Immigration Issues .................................................................................................................... 9

ARGUMENT .................................................................................................................................9

    I.    The Totality of the Circumstances Demonstrates that Argentina Was Not the Child's Habitual Residence at the Time of Retention................................10

    II.    The Fact That Ms. Huff and the Child were Trapped in Argentina Further Undercuts Any Claim That Argentina was the Child's Habitual Residence ...............................................................................................11

    III.    In Light Of Petitioner's Failure to Prove Argentina was the Child's Country Of Habitual Residence, Custody of the Child Should be Determined in the U.S. ......................................................................................14

CONCLUSION ............................................................................................................................16

# **PRELIMINARY STATEMENT**

Respondent Amy Huff respectfully submits this memorandum of law in connection with the May 8, 2024 hearing on the threshold matter of habitual residence in this proceeding seeking to invoke the Hague Convention on the Civil Aspects of International Child Abduction (the "**Hague Convention**").

In order to maintain a proceeding under the Hague Convention seeking to force the return of a child to a country from which a parent has fled with the child, a petitioner is required to first prove that that country was the child's "habitual residence." The purpose of the habitual residence requirement aligns with a core premise of the Hague Convention: that custody be litigated in the country that will best serve the interests of—and protect—the child.

Whether a country is the child's habitual residence is based on a "common sense" evaluation of the "totality of the circumstances" of each case. *Monasky v. Taglieri*, 589 U.S. 68, 78, 84 (2020). No one factor is determinative and, as discussed below, the case law makes clear that the mere fact of child's birth—his "mere physical presence"—in a country is insufficient as a matter of law. *Id.* at 81.

Here, the only fact that would support Petitioner's contention that Argentina was the Child's habitual residence is his birth there. Every other relevant fact confirms unequivocally that Argentina was never this Child's habitual residence, and that forcing his return there would wreak havoc with the Child's life. Discovery has shown, and the hearing will confirm that the following key points are undisputed:

- **Neither parent had been living in Argentina until the eve of the Child's birth. Petitioner had left more than twelve years earlier, and Ms. Huff had never been there;**
- **Petitioner convinced Ms. Huff to give birth in Argentina, solely as a last resort because his prior immigration violations prevented him from going to the other countries they preferred—including the United States;**

- **The parties had no intention of remaining and raising the child in Argentina, and planned to travel outside the country with the Child by van shortly after the Child's birth;**
- **The *only* reason the parties remained in Argentina for as long as they did was because the COVID-19 pandemic made those travel plans impossible; and**
- **Ms. Huff felt—and was—trapped in Argentina even before the Child was born, remaining there only because she had no choice, including because Petitioner refused to cooperate with her attempts to leave with the Child, even if only for a visit.**

Given these facts, virtually all of which will be undisputed at the hearing, it is clear that Petitioner cannot sustain his burden of proving that Argentina was the Child's country of habitual residence. Accordingly, the Court should dismiss the petition, and there are important reasons to do so now. Most importantly, dismissal at this juncture would allow the determination of the Child's custody to proceed promptly in Missouri, which—consistent with the fundamental purpose of the Hague Convention—would clearly be in the best interests of the child.

## FACTUAL BACKGROUND[1]

Ms. Amy Huff was born and raised in Missouri. Ex. 58 (Huff Tr.) at 9:11–15. She is thirty-three years old and graduated from Missouri State University with a bachelor's degree in anthropology in May 2016 before going on to complete her master's in applied anthropology in September 2017. *Id.* at 9:16–10–13. She is currently an education abroad advisor at the Missouri State University, where she works full-time. *See* Ex. 56 (Respondent's Amended Responses and Objections to Petitioner's First Set of Interrogatories) at 5.

Petitioner, thirty-eight years old, was born in Argentina but has lived a nomadic lifestyle since leaving Argentina when he was around twenty-one. *See* Ex. 1 (Alzu Tr.) at 24:18–21, 28:16–19. Before he returned to Argentina, the last time Petitioner had lived in Argentina was in 2007—seventeen years ago—and he has not stayed anywhere in Argentina for more than three months

---

[1] Attached hereto as **Appendix A** is a factual timeline of major events for the Court's reference.

since that time. *See id.* When he returned to Argentina in September 2019, several months before the Child's birth, he had not even visited in almost three years. *See* Ex. 1 (Alzu Tr.) at 23:24–24:1, 30:22–31:2; Ex. 57 (Petitioner's Objections and Supplemental Answers to Respondent's First Set of Interrogatories) at 2. Petitioner has been working at his mother's domestic partner's pet food store three days a week, but this has been the longest period that he has worked for any employer in Argentina. Ex. 1 (Alzu Tr.) at 42:3–6. The only other "job" Petitioner has held for a longer time, was as an "artisan" or "street artist." Ex. 1 (Alzu Tr.) at 41:23–42:1.

### A. The Parties Met Traveling in Colombia and Planned to Travel with the Child

After Ms. Huff completed her master's degree in September 2017, she traveled intermittently, and ultimately visited Colombia, where she met Petitioner at a "Rainbow Gathering."[2] *See* Ex. 2 (HUFF_006370) at HUFF_006371; Ex. 3 (HUFF_005201) at 005202. After the gathering concluded, Ms. Huff traveled with Petitioner and other friends around Colombia looking for a site for a future Rainbow Gathering. *See* Ex. 2 (HUFF_006370) at HUFF_006371; Ex. 3 (HUFF_005201) at 005202. The Parties were in a relationship as of the spring of 2019, Ex. 3 (HUFF_005201) at 005202, and Ms. Huff became aware she was pregnant by mid-July. *See* Ex. 4 (HUFF_003272) at HUFF_003273. Mexico, Chile, Colombia, and the United States were all options they considered for where to travel to. *See* Ex. 5 (HUFF_005190) (Colombia); Ex. 6 (HUFF_003331) at 003332–33 (Mexico and Chile); Ex. 7 (HUFF_003298) at 003299 (United States); Ex. 8 (HUFF_005605) at 005606 (United States). However, Petitioner had immigration issues with the majority of the countries the two considered due to his prior illegal entries or exits. Ex. 9 (HUFF_003823) at 003829–30.

---

[2] A Rainbow Gathering is a "temporary community of people" who share an ideology of "peace, harmony, freedom and respect." Ex. 10 (Benazir Wehelie, *Nineteen years under the rainbow*, CNN.COM (Mar. 22, 2015, 8:43 PM), https://www.cnn.com/2015/03/22/world/cnnphotos-rainbow-gathering/).

Petitioner did not care what country the Child was born in. Ex. 1 (Alzu Tr.) at 58:15–59:1 (admitting he "suggested [having the baby] in any part of the southern hemisphere," and agreeing that did not "necessarily [mean only] Argentina"). Nor did he "even know if [he] want[ed] to enroll [his] child under any national flag." Ex. 11 (HUFF_004975_EN) at 004981. And Petitioner has admitted that even after they decided on Argentina for the birth, the couple planned to continue to "travel around in a motorhome" shortly after the Child's birth, "[as] soon as the three of us would be ready." *See* Ex. 1 (Alzu Tr.) at 65:7–11, 78:3–11. As Petitioner admitted, they had no plan to live in Argentina for an extended period or to raise their Child there. Ex. 12 (HUFF_004965) at 004971; *see also* Ex. 1 (Alzu Tr.) at 62:6–9.

### B. Ms. Huff Returned Home, and Petitioner Begrudgingly Went to Argentina To Try To Obtain a U.S. Visa, but Convinced Ms. Huff to Come for the Birth

In hopes of staying there with Petitioner, Ms. Huff applied for a Colombian visa. *See* Ex. 6 (HUFF_003331) at 003333. Her application was denied, and so, in August 2019, she returned home to the United States because without a visa, she could not obtain healthcare in Colombia. *Id.*; Ex. 13 (HUFF_004763) Ex. 58 (Huff Tr.) at 33:6–7, 33:21–34:5. Petitioner had overstayed his Colombian visa, and so he hitchhiked—and took buses, for which Ms. Huff financed—to Argentina where he returned solely to try to obtain a U.S. visa. *See* Ex. 11 (HUFF_004975_EN) at 004988; Ex. 14 (Alzu-001725); *see also* Ex. 15 (HUFF_003344) at 003345 (noting Petitioner is "not a huge fan" of Argentina). Petitioner admits, that as of August 2019, "the plan" was "work [in Argentina] doing something" and "ask Uncle Sam for permission to let [him] in" to the United States. Ex. 11 (HUFF_004975_EN) at 004988; *see also* Ex. 1 (Alzu Tr.) at 57:16–21, 61:8–14 (Petitioner admitting that "one of [his] plans" was to "try to get a visa in the United States.").[3]

---

[3] Only upon arriving in Argentina, did Ms. Huff learn that Petitioner had not obtained the type of work necessary to acquire a U.S. visa. Ex. 58 (Huff Tr.) at 34: 14–35:9, 47:13–19.

Petitioner convinced Ms. Huff to travel from the United States to Argentina—where she had never been before to give birth. *See* Ex. 9 (HUFF_003823) at 003828–29. She ultimately traveled there in December of 2019, six months pregnant, as Petitioner could not then legally enter the United States,[4] Mexico, and other countries, as well because Argentina had free healthcare and they were interested in pursuing a home birth. *See id.* Additionally, Ms. Huff went to Argentina because she was "a bit more adaptable than" Petitioner, and thought he might be ready to leave by the time she arrived. Ex. 3 (HUFF_005201) at 005205–06. In fact, as Petitioner conceded at this deposition, he told Ms. Huff he did not "intend to live" in Argentina "forever." Ex. 1 (Alzu Tr.) at 62:6–9; *see also* Ex. 12 (HUFF_004965) at 004971.

Ms. Huff never planned to stay in Argentina either. *See* Ex. 3 (HUFF_005201) at 005202. In fact, once she arrived in Argentina, by February 6, 2020, she "fe[]l[t] so trapped," and wanted to return to the United States, but was "[t]oo far along to fly." Ex. 16 (HUFF_003416) at 003421 (first ellipses added) ("I feel so trapped and so f_cked . . . [5]like I can't go home . . . not at least until the baby is born"); Ex. 17 (HUFF_003426) at 003427. A full month before the Child was born, Ms. Huff wanted to leave, but knew she could not "leave with baby until [she] g[o]t his passport." Ex. 17 (HUFF_003426) at 003427. Before traveling to Argentina, Ms. Huff had confirmed the steps with the U.S. Embassy that would be necessary to get the Child's U.S. citizenship, despite him being born abroad. Ex 18 (HUFF_005841) at 005843. Additionally, Ms.

---

[4] Petitioner was deported from the United States in roughly 2012. *See* Ex. 1 (Alzu Tr.) at 68:8–14, Ex. 14 (Alzu-001725) (discussing that Petitioner had been deported from the United States more than ten years before the referenced exhibit). Thus, even under the traditional ten year bar prohibiting Petitioner from entering admission to the United States, should no longer be in effect. *See* U.S. Citizenship and Immigration Services, *Unlawful Presence and Admissibility*, https://www.uscis.gov/laws-and-policy/other-resources/unlawful-presence-and-inadmissibility (last updated June 24, 2022). Petitioner admitted that "[he] ha[s not] done anything" to determine whether or when he can enter the United States legally. Ex. 1 (Alzu Tr.) at 48:22–24.

[5] Unless otherwise indicated, ellipses in quotes from produced documents appear in the original.

Huff obtained U.S. Medicaid pregnancy coverage, which enrolled the Child for U.S. healthcare after he was born, *but only for medical costs incurred in the United States*.[6]  *See* Ex. 19 (HUFF_005939); Ex. 20 (HUFF_006378).

### C.  The COVID-19 Pandemic Prevented Anyone from Leaving Argentina

Almost immediately after the Child was born on March 4, 2020, the COVID-19 pandemic made the plans to leave Argentina all but impossible.  *See* Ex. 1 (Alzu Tr.) at 71:24–72:6, 78:25–79:6; Ex. 58 (Huff Tr.) at 57:3–4.  On March 11, 2020—one week after the Child was born—the World Health Organization declared COVID-19 a global pandemic.[7]  *See* Ex. 1 (Alzu Tr.) at 70:2–7.  At that point, the Child was too young to fly and too young for there to have been time to be issued a passport.  Argentina had some of the firmest, and longest lasting, COVID-19 restrictions in the world.[8]  As of at least March 13, 2020, the U.S. Embassy in Argentina was both physically closed and not operating remotely or virtually.[9]  Then on March 19, 2020, Argentina entered an official national quarantine period,[10] and by March 26, 2020, the country's borders were fully closed.[11]

### D.  Ms. Huff and the Child were Trapped in Argentina During COVID-19

But for the pandemic, as discussed *supra* Sections II.A–B, Ms. Huff and Petitioner had planned to travel with the Child, specifically for the next Rainbow Gathering in Chile, just a few

---

[6] "U.S. Medicare and Medicaid do not cover medical costs overseas."  Ex. 21 (U.S. Department of State, *Insurance Coverage Overseas* (February 23, 2024)).

[7] Ex. 22 (World Health Organization, *WHO Director-General's opening remarks at the media briefing on COVID-19 - 11 March 2020*, WORLD HEALTH ORG. (Mar. 11, 2020)).  The United States declaring a national emergency and travel ban two days later.  Ex. 23 (*CDC Museum COVID-19 Timeline*, CENTER FOR DISEASE CONTROL AND PREVENTION).

[8] Ex. 24 (Terrence McCoy et al., *Argentina Locked Down Early and Hard.  Now Cases Are Exploding*, WASH. POST. (Oct. 27, 2020)).

[9] *See* Ex. 25 (U.S. Mission Argentina, U.S. Embassy in Argentina, *Information for Visa Applicants on Coronavirus Situation* (Mar. 13, 2020)).

[10] Ex. 26 (Decree No. 297, Mar. 19, 2020 [34.334] B.O. 3 (Arg.)).

[11] Ex. 27 (Decree No. 313, Mar. 26, 2020 [34.340] B.O. 3 (Arg.)).

months after Ms. Huff was slated to give birth. Ex. 6 (HUFF_003331) at 003333; *see* Ex. 1 (Alzu Tr.) at 71:24–72:6, 78:25–79:6 (Petitioner admitting the "plan" was "to travel around South America in a van with [Ms. Huff] and [the Child]," but that "was not possible" because of the pandemic); Ex. 58 (Huff Tr.) at 45:13–24 ("we would have been planning to arrive in Chile no later than November of 2020). Their plans were quashed by the COVID-19 pandemic. *See* Ex. 1 (Alzu Tr.) at 71:24–72:6, 78:25–79:6. In short, through circumstances outside Ms. Huff's control, all three were trapped in Argentina.[12]

Despite COVID-19 restrictions, Ms. Huff attempted to file and receive the paperwork that would be needed for her and the Child to travel once the restrictions were lifted. First and foremost, the Child's passport and citizenship. *See, e.g.*, Ex. 17 (HUFF_003426) at 003427 (the Child's passport); Ex. 28 (HUFF_005655) at 005656 (the Child's citizenship). Ms. Huff also believed she needed to get an Argentinean national identity card ("**DNI**") so that she could leave Argentina legally with the Child, as she feared she might not be permitted to exit the country with the Child, if she did not have a legal way to re-enter, as her visa expired. Ex. 29 (HUFF_005607) at 005609. Further, Ms. Huff needed a DNI for necessities while trapped in Argentina. *See* Ex. 30 (HUFF_005252) at 005255.[13]

Even with the hurdles caused by COVID-19,[14] Ms. Huff tried to return to her home in Missouri to visit her family. Ex. 31 (HUFF_005621) at 005627; Ex. 32 (HUFF_005284) at 005286; Ex. 33 (HUFF_005900) at 005910–01. Petitioner, knowing that Ms. Huff "felt

---

[12] Ms. Huff and Petitioner even considered leaving Argentina by car. *See* Ex. 35 (HUFF_005428).
[13] In *Maxwell v. Maxwell*, where Respondent filled out permeant residency applications in Australia the Fourth Circuit affirmed the district court's finding that Australia was not the habitual residence of the child where respondent "realized that she was not going to be able to leave Australia immediately." 588 F.3d 245, 249–53 (4th Cir. 2009).
[14] *See* Ex. 36 (HUFF_005885) (providing that through, at least June 2020, U.S. Embassy "regular passport, citizenship, and notarial services have been suspended").

imprisoned" in Argentina, refused to cooperate. Ex. 34 (HUFF_003497) at 003498; Ex. 1 (Alzu Tr.) at 78:3–11. As early as June 2020, Petitioner refused to go to the U.S. Embassy to get the Child's U.S. passport. Thereafter, Petitioner refused time and time again to complete even the most basic paperwork to allow the Child to obtain a U.S. passport and travel to Springfield—even for a visit to meet his maternal family. *See* Ex. 33 (HUFF_005900) at 005905 (refusing to go to the U.S. Embassy for the Child's U.S. passport as of June 2020). Petitioner's refusal continued even after Ms. Huff filed a police report against him, following a particularly harrowing incident of domestic violence. Ex. 37 (HUFF_004742) (police report dated February 1, 2021); Ex. 38 (HUFF_000182) at 000185–86 (refusing to sign paperwork for the Child to leave Argentina for a visit, as well as the Child's U.S. passport on February 8, 2021); Ex. 39 (HUFF_005577) at 005578 (Ms. Huff travels to U.S. Embassy to obtain Child's passport and citizenship on March 15, 2021); Ex. 40 (HUFF_005931) (stating a notary error required Petitioner to re-sign the documentation, which he refused as of March 18, 2021); Ex. 41 (HUFF_003996) at 003998 (same).

### E. Six Weeks After Borders Opened Ms. Huff and the Child Traveled to Missouri

Due to Petitioner's refusals, Ms. Huff sought refuge in the Argentine courts immediately after Argentinian borders official opened.[15] Ex. 42 (HUFF_000639) at 000639–41; Ex. 43 (HUFF_004768). On December 9, 2021, Ms. Huff received an Argentinian court order that enabled her to travel to the United States the following month. Ex. 43 (HUFF_004768). As a condition to being permitted to leave, Ms. Huff was required to agree that she would return to Argentina with the Child within forty days of leaving, and fearing she had no choice, she did so. *See id.* On December 14, 2021, Ms. Huff and the Child left Argentina for Springfield, Missouri.

---

[15] *See* Ex. 47 (Decree No. 678, Sept. 30, 2021, [34.761] B.O. 3 (Arg.)).

*See* Ex. 44 (HUFF_004682). On January 17, 2022, after consulting lawyers, Ms. Huff decided that she and the Child would remain in Springfield, Missouri. *See* Ex. 45 (HUFF_004326) at 004327; Ex. 46 (HUFF_004322) (stating that as of January 12, 2022, Ms. Huff was "hoping to not go back" to Argentina, but was "waiting on a positive word from some lawyers first"). On January 20, 2022, Ms. Huff informed Petitioner that she and the Child would not return to Argentina. Ex. 59 (HUFF_002863).

### F. Petitioner is in Argentina Because of this Litigation and Immigration Issues

While Petitioner resides in Argentina, the evidence reveals that not even he—let alone the Child—is firmly rooted in there. Petitioner admitted that in 2021 and 2022—after the Child was born—the only reason he was not in Brazil, was because he did not want to enter Brazil illegally. *See* Ex. 1 (Alzu Tr.) at 53:11–16. Petitioner has told friends recently that he "would like to . . . be free and travel" and that he is "fed up with the city," but he remains in Argentina because of this dispute and the fines he would have pay to travel to other countries due to him previously overstaying his visas. Ex. 48 (Alzu-000325) (ellipses added); Ex. 49 (Alzu-001717). Petitioner also admitted, "it's probable" he will "get tired of working and . . . want to travel again." *See* Ex. 1 (Alzu Tr.) at 47:2–4, 48:2–5.

### ARGUMENT

The Hague Convention, provides for the return of children who were "wrongfully removed or retained" away from their "habitual residence." 22 U.S.C. § 9001(a)(4); *Barzilay v. Barzilay*, 600 F.3d 912, 916–17 (8th Cir. 2010); Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10494, 10504 (Dep't of State Mar. 26, 1986) ("[T]he [Hague] Convention may be invoked only where the child was [a] habitual[] resident in a Contracting State[.]"). As a threshold matter, to establish a prima facie case it is the petitioner's burden to prove that the country to which return is sought is the Child's country of "habitual residence." 22

U.S.C. § 9003(e)(1)–(f)(1). Only then does the Hague Convention apply. It is clear that Argentina was not the Child's habitual residence because the Parties had no meaningful connection to Argentina before the Child's birth and they did not plan to stay and raise the child there. Ms. Huff and the Child remained in Argentina only because they were trapped by the COVID-19 pandemic and Petitioner's coercion. Moreover, the Child certainly has no meaningful connection to Argentina other than his fortuitous birth there.

I. **The Totality of the Circumstances Demonstrates that Argentina Was Not the Child's Habitual Residence at the Time of Retention**

Although the Hague Convention does not define the term "habitual residence," it is clear that "mere physical presence" is not a "dispositive indicator of an infant's habitual residence." *Monasky*, 589 U.S. at 76–77, 81. And there certainly is no "bright line rule" that the country where a child is born "is automatically" the country of habitual residence. *Delvoye v. Lee*, 224 F. Supp. 2d 843, 851 (D.N.J. 2002), *aff'd*, 329 F.3d 330 (3d Cir. 2003). Rather, the determination of "habitual residence depends on the specific circumstances of the particular case." *Monasky*, 589 U.S. at 78. This is a "fact-driven inquiry," and the Hague Convention gives courts "maximum flexibility" to act based on the precise scenario before it, "informed by common sense." *Id.* at 78–79. Where, as here, a child is "too young or otherwise unable to acclimate," courts consider "the intentions and circumstances of caregiving parents." *Id.* Most importantly, the Supreme Court emphasized in *Monasky* that courts should use "common sense" in determining, based on the "totality of the circumstances," whether a country is a child's "habitual residence" ***and that the "aim [is] to ensure that custody is adjudicated in what is presumptively the most appropriate forum—the country where the child is at home."*** *Id.* at 78–79 (emphasis added).

*Delvoye v. Lee* is on point. 329 F.3d 330 (3d Cir. 2003). There, the Third Circuit upheld the district court's finding that the child's habitual residence was not Belgium, where the parents

traveled to Belgium to have the baby and only planned to live there temporarily. *Id.* That is precisely the situation here. As discussed, above, but for the unforeseen circumstances of the COVID-19 pandemic, the Parties would not have stayed in Argentina, and other than the child's coincidental birth there, there are no facts that lend support to a claim that Argentina was his habitual residence.

Absent the unforeseen circumstances of the COVID-19 pandemic discussed above, the Parties would not have stayed in Argentina, and other than the child's coincidental birth there, there are no facts that lend support to a claim that Argentina was his habitual residence. Moreover, the time Ms. Huff and the Child spent in Argentina was anything but stable or firmly rooted. The two lived in four different apartments and houses during their twenty-one month stay. *See* Ex. 50 (Respondent's Amended Responses and Objections to Petitioner's First Set of Requests for Admission) at 4; Ex. 17 (HUFF_003426) at 003427; Ex. 51 (HUFF_005461) at 005464. None of these were owned by Petitioner or Ms. Huff, and the only one of which Ms. Huff did lease, was so that she and the Child could have a safe backyard to spend time outside, especially important given the COVID-19 pandemic. Ex. 30 (HUFF_005252).

**II.     The Fact That Ms. Huff and the Child were Trapped in Argentina Further Undercuts Any Claim That Argentina was the Child's Habitual Residence**

Courts have declined to find habitual residence in a country where "the removing spouse is coerced involuntarily to move to or remain" there. *Silverman v. Silverman*, 338 F.3d 886, 900 (8th Cir. 2003); *see also Monasky*, 589 U.S. at 78 (stating courts should consider if a "caregiving parent had been coerced into remaining" in the country); *Sain ex rel. V.R.S. v. Sain*, 548 F. Supp. 3d 1181, 1183, 1190–93 (M.D. Fla. 2021). Traditionally, courts have found that where a petitioner coerced or used deceit to move or keep the respondent in a foreign country, the country was not the habitual residence of the child. *Silverman*, 338 F.3d at 900. General threats, demands, and

controlling nature—even where not connected to remaining in the country—can constitute coercion. *See Nisbet v. Bridger*, 2023 WL 6998081, at *4–5, *7 (D. Or. Oct. 24, 2024), *appeal filed*, No. 23-3877 (9th Cir. Nov. 30, 2023). In particular, courts have made clear that children do not become habitual residents of a country where, as here, they were forced to remain due to COVID-19 restrictions. *See, e.g.*, *id.*; *Sain*, 548 F. Supp. 3d at 1190–93; *New York ex rel. B.E. v. T.C.*, 164 N.Y.S.3d 374, 379–80 (N.Y. Sup. Ct. 2022).

For example, in *Sain*, the court held that the United Kingdom was not the children's habitual residence where COVID-19 border restrictions thwarted the "original plan" of "return to China" and caused the children to remain in the United Kingdom. 548 F. Supp. 3d at 1183, 1190–93. Similarly, in *New York ex rel. B.E. v. T.C.*, the court considered COVID-19 travel restrictions when evaluating whether England became the child's habitual residence while he was living there with petitioner from 2019 to 2021. 164 N.Y.S.3d at 379–80. The court found England was not the child's habitual residence because, although he remained there for the majority of the pandemic, the parents had not intended for England to be the child's home. *Id.*

*Nisbet* is instructive here. *See* 2023 WL 6998081. There, where respondent moved to Scotland to give birth to her second child, who was born in late February 2020, the court found neither child became a habitual resident of Scotland. *Id.* at *4, *6–7. In its findings of fact, the Court noted that the U.S. consulate closed due to the COVID-19 pandemic before the respondent was able to make an appointment to apply for the child's passport and other necessary paperwork to establish U.S. citizenship. *Id.* at *4. There, like here, it took a long time for petitioner to sign necessary paperwork to allow the child to travel. *Id.* at *4–5. In *Nisbet*, petitioner signed the paperwork twenty-two months after birth. *Id.* Here, roughly thirteen months, Ex. 52 (HUFF_005935). There, respondent stayed in Scotland for an additional six months—leaving

when the child was twenty-eight months old. 2023 WL 6998081, at *4–5. Here, Ms. Huff left just five days after receiving the court order permitting her to do so. *See* Ex. 43 (HUFF_004768) (12/9/2021 court order); Ex. 44 (HUFF_004682) (12/14/2021 flight tickets); *see also* Ex. 53 (HUFF_005434) (11/17/2021 underlying mediation).

Although the petitioner and respondent in *Nisbet* had lived together in both Scotland and the Island of Jersey since 2015, the court noted in its analysis that when respondent went to Scotland at the end of 2019 to give birth, petitioner had not lived there for "several years." *See* 2023 WL 6998081, at *2, *7 (noting that petitioner moved from Scotland to Island of Jersey in summer of 2017). In the end, despite what at face value might have appeared to be an extended stay, the court found Scotland was not the children's habitual residence—and that the children had no habitual residence—where Respondent had expressed desires to return to Oregon. *Id.* at *6–7.

Here, Argentina imposed one of the strictest and longest nationwide lockdowns.[16] Despite the numerous regulatory barriers preventing Ms. Huff from leaving, she still tried. *See* Ex. 31 (HUFF_005621) at 005627. Additionally, Ms. Huff could not leave Argentina without Petitioner's consent and cooperation, which he repeatedly refused to provide. Ex. 30 (HUFF_005252) at 005255; Ex. 54 (Alzu-004795_EN) at 004796, 004797.

Petitioner's refusals to sign paperwork—which went hand in hand with the physical violence[17] to which he subjected Ms. Huff—resulted in external factors—beyond COVID-19—

---

[16] Ex. 24 (Terrence McCoy et al., *Argentina Locked Down Early and Hard. Now Cases Are Exploding*, WASH. POST. (Oct. 27, 2020)).

[17] Although the Court has bifurcated the issues here, and will reach Respondent's affirmative defense of grave risk of harm if Petitioner meets his burden on habitual residence, the record already establishes the horrendous abuse Ms. Huff suffered at the hands of Petitioner. Respondent filed under seal with this Court, true and correct copies of photographs taken by Respondent after two different incidents in which Petitioner subjected Respondent to his physical violence. Notice (Sealed) Exhibit A, filed in support of Suggestions in Opposition [ECF No. 37]. In the face of those photographs, Petitioner has admitted at his deposition that he could not even remember how

that prevented Ms. Huff and the Child from leaving Argentina, even for a visit to the United States. *See* Ex. 38 (HUFF_000182) at 000185; Ex. 41 (HUFF_003996) at 003997–98; Ex. 55 (HUFF_004030) at 004032; Ex. 54 (Alzu-004795) at 004797, 004806. In short, Ms. Huff and the Child were trapped in Argentina. Petitioner admits he knew she felt "imprisoned" there, yet he would not let them leave. Ex. 55 (HUFF_004030) at 004032; Ex. 30 (HUFF_005252) at 005254–56; Ex. 1 (Alzu Tr.) at 78:3–11. There can be no question that Ms. Huff had absolutely no intention of making Argentina the Child's home.

**III.     In Light Of Petitioner's Failure to Prove Argentina was the Child's Country Of Habitual Residence, Custody of the Child Should be Determined in the U.S.**

As Petitioner cannot sustain his burden of proving that Argentina was the Child's habitual residence, his petition should be dismissed.

The consequence of the Court dismissing Petitioner's petition will be that custody of the Child will be determined in Missouri, which would unquestionably be in the Child's best interest— the touchstone of the Hague Convention. *See* 51 Fed. Reg. 10494, 10505 (1986); *Ohlander v. Larson*, 114 F.3d 1531, 1541 (10th Cir. 1997). The Child has enjoyed a stable childhood in Missouri, where his mother—who since his birth has been his primary and virtually sole caretaker—provides not only decent, reliable housing, but appropriate clothing, quality daycare, and extracurricular activities (from gymnastics to soccer). In stark contrast, forcing him to return and live in Argentina for the duration of a multi-year custody litigation would be disastrous for the

---

many times he strangled and punched Ms. Huff—in front of the child, and that he stuffed a sock in her mouth. *See* Ex. 1 (Alzu Tr.) at 90:11–91:5–9; 110:3–6. Thus, this case is clearly distinguishable from *Tsuruta v. Tsuruta*, where the Eight Circuit found allegations of coercion insufficient where there was a "lack of physical abuse, violence, or threats of violence," which are typically present in "instances where coercion impacted the habitual residence determination." *See* 76 F.4th 1107, 1110 (8th Cir. 2023).

Child. Petitioner has never had meaningful employment, or steady housing.[18] He could not begin to provide the Child with the kind of stable life he is enjoying in Missouri today. Additionally, if Ms. Huff were forced to return to Argentina, she would have to give up her stable, gainful employment at Missouri State University—complete with benefits for herself and the child. At the same time, Petitioner, by his own admission is likely to get tired of working and aims to resume his travelling and itinerant lifestyle again soon.

In sum, in light of Petitioner's failure to establish that Argentina was the Child's habitual residence, the petition must be dismissed. There is no burden on Respondent to prove, and no need for a court to determine, an alternative habitual residence. *Pope v. Lunday*, 835 F. App'x 968, 971 (10th Cir. 2020); *Watts v. Watts*, 935 F.3d 1138, 1147–48 (10th Cir. 2019).[19] Moreover, in the event that the Court were to determine that a finding of habitual residence is required, the Child's habitual residence at the time of alleged improper retention—January 17, 2021[20]—was the United States. Ms. Huff always intended to return to the United States, and Petitioner only went to Argentina *in order to get a U.S. visa* so that he could go there with Ms. Huff and the Child.

---

[18] Petitioner currently lives in an apartment his family inherited. Ex. 1 (Alzu Tr.) at 39:15–18.

[19] In *Monasky,* the Supreme Court addressed the issue of whether a petitioner was required to prove the existence of an "actual agreement" between parents identifying the child's habitual residence. The Court very sensibly held that no such agreement was necessary and that, as explained above, the habitual residence determination should be based on an analysis of the facts, and the totality of circumstances, of each case—guided by the best interests of the child. In the course of explaining the reasoning for its holding, the Court noted. in dicta, that if an actual agreement were required it "would create a presumption" of no habitual residence for infants in all of the many cases where there is no such express agreement between the parents—i.e., even where an analysis of the facts and circumstances of a case establishes that a country from which a child was removed *was* his habitual residence. 589 U.S. at 81. The Court was properly concerned that such a presumption would leave many kidnapped infants outside of the Hague Convention when the facts and circumstances would otherwise demonstrate that it should apply. However, that does not mean there could never be a case where there is no habitual residence. *See id.* Here, *Monasky* and the "totality of the circumstances" demonstrates the child had no habitual residence—with the consequence being that custody should be litigated and determined in Missouri.

[20] Ex. 45 (HUFF_004326) at 004327.

*See* Ex. 54 (HUFF_004975_EN) at 004988. Additionally, absent being trapped in Argentina due to COVID-19 and Petitioner's coercion, Ms. Huff and the Child would have either returned to the United States much sooner, and/or have spent a significant amount of time there by January 2021. Upon arrival to the United States, the Child was immediately surrounded by friends and family, with a stable roof over his head, and enrolled in daycare—where he began making friends in short order. Accordingly, consistent with the underlying purpose of the Hague Convention, custody of the Child should be determined in Missouri, which an analysis of the totality of the circumstances demonstrates would clearly be in the best interest of the Child. *See Monasky*, 589 U.S. at 81–82.

Finally, there is an additional, important reason to dismiss the petition now and to dispense with the unnecessary trial concerning Ms. Huff's affirmative defense under the Hague Convention's grave risk of harm exception. Petitioner has already admitted at his deposition that he not only repeatedly punched Ms. Huff, but stuffed a sock in her mouth and strangled her—a well-known indicia of lethality[21]—more times than he can remember. *See* Ex. 1 (Alzu Tr.) at 90:11–91:10. Forcing Ms. Huff to relive the horrible abuse she suffered at an unnecessary trial would not only be a waste of the Court's valuable time and resources, but could be re-traumatizing for Ms. Huff and potentially harmful to the child as well. In light of Petitioner's clear failure to satisfy the Habitual Residence prerequisite, this case can and should be disposed of now.

## CONCLUSION

For the foregoing reasons, we respectfully submit the Court should find for Respondent and enter a judgment dismissing the petition and affording any additional relief the Court determines is just and proper.

---

[21] Nancy Glass, et al., *Non-fatal Strangulation is an Important Risk Factor for homicide of Women*, 35 J. EMERG. MED. 3 (2007).

Dated: May 1, 2024

/s/ Richard A. Rothman
Richard A. Rothman, *Pro hac vice*
John J. Nolan, *Pro hac vice*
Elaina K. Aquila, *Pro hac vice*
Rebecca K. Jaeger, *Pro hac vice*
Emma Evans, *Pro hac vice*
**WEIL, GOTSHAL & MANGES LLP**
richard.rothman@weil.com
jack.nolan@weil.com
elaina.aquila@weil.com
rebecca.jaeger@weil.com
emma.evans@weil.com
767 Fifth Avenue
New York, NY 10153
Telephone: 212-310-8000
Facsimile: 212-310-8007

–and–

Samuel N. Sherman, MO #71171
**SANDBERG PHOENIX & VON GONTARD P.C.**
ssherman@sandbergphoenix.com
4600 Madison Avenue, Suite 1000
Kansas City, MO 64112
Telephone: 816-425-9690
Facsimile: 816-627-5532

*Pro Bono Attorneys for Amy Nichole Huff*