IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

**LUCAS ALZU**,

          Petitioner,

vs.

**AMY NICHOLE HUFF**,

          Respondent.

Case No.: 23-cv-3022-MDH

**ORDER**

On May 8, 2024, the Court held a hearing on the issue of habitual residence. The parties presented evidence on the issue and subsequently filed supplemental briefing regarding whether a finding of habitual residency is required under the Hague Convention. The issue is now ripe for a ruling.[1]

Petitioner, the father in this case, instituted this proceeding by filing a Petition for Return of Child. Petitioner alleges that the child is a habitual resident of Argentina and that at the time Respondent, the mother, removed the child from Argentina she was in violation of the Hague Convention and ICARA. Petitioner requests that the Court issue an Order and judgment returning the child to Argentina where any custody determinations can be made in the appropriate courts in that country.

---

[1] The parties previously filed a joint motion for appointment of co-mediators. The parties indicated a desire to mediate the issues presented. However, the case was not resolved.

Respondent argues that the child's habitual residence is not Argentina. While Respondent does not argue a different habitual residence, Respondent takes the position that the Court does not have to find a habitual residence for the child in this case.

**BACKGROUND**

Respondent, Amy Huff, was born and raised in Missouri. She completed her master's degree in 2017 and then began to travel. Petitioner was born in Argentina. Petitioner has also traveled extensively and the last time he lived in Argentina full time was in 2007. The parties met at a Rainbow gathering in the country of Columbia.[2] Both parties were in Columbia when they met. A romantic relationship evolved between the parties and Respondent discovered she was pregnant after a few months. At that time, while the parties were living in Columbia on a coffee ranch, the terms of their visas had expired and neither party could renew their visas. The parties testified they would have stayed in Columbia if it had been an option to renew their visas. Instead, the parties agreed to leave Columbia.

The parties discussed Mexico, Chile, and the United States as options. Respondent testified she preferred to give birth in Mexico or the United States. However, Petitioner could not legally enter the United States because he had previously been deported in 2013. In addition, while the record is unclear, the Petitioner also did not have a visa to enter Mexico. Petitioner suggested Argentina where his family resided.

The parties left Columbia and Respondent initially returned to the United States to visit her family. Petitioner traveled back to Argentina. Respondent ultimately agreed to travel to Argentina to have the baby. Both parties testified their plan was to organize and attend a Rainbow gathering

---

[2] Rainbow gatherings have been described to the Court as a gathering where people around the world are living in peace and surrounded by nature.

in the country of Chile after the baby was born. The parties testified about their intentions to travel within South America in a van. It appears both parties intended to travel with their child and to continue organizing and attending Rainbow gatherings. It is clear, at the time of these discussions, both parties were interested in continuing a nomadic lifestyle.

However, the specifics of the parties' plan for after the birth are disputed. Petitioner contends it was their plan to make Argentina their home base from which their travels would originate and to which they would return following travel. Respondent denies there was ever any discussion of Argentina being their "home" and that they did not agree that Argentina would be their "home base." Respondent states prior to moving to Argentina for the birth of the child Petitioner had not lived in Argentina for many years. Respondent testified that Petitioner did not want their child to be enrolled under any national flag. Petitioner states he may have said that at one time but that is not how he felt after the child was born.

The parties initially lived with Petitioner's family. However, the parties' relationship began to deteriorate. Respondent and Petitioner testified that Respondent was no longer comfortable living in Petitioner's parents' home and so the couple moved to an apartment owned by Petitioner's relative. After the move to the apartment the relationship continued to deteriorate. However, Petitioner and Respondent moved out of the apartment and signed a three-year lease to rent a house further from the city. The child was born in Argentina just weeks before the COVID-19 pandemic.

Respondent testified she was the victim of acts of violence by Petitioner. The evidence reflects an order of protection against Petitioner was entered by Argentina courts. Petitioner eventually moved out of the home. The parties dispute the reason for this move. Petitioner testified Respondent was also violent. However, the parties ultimately broke the lease agreement. Petitioner had moved out and eventually Respondent went to live with a new boyfriend.

Despite the end to the parties' relationship, Petitioner's family continued to have contact with the child and the Respondent. Respondent spent the child's first Christmas with Petitioner's family. However, there was testimony that Petitioner did not join his family for Christmas. No reason was given for his absence.

Respondent testified she wanted to return to the United States with the child but one week after the child's birth travel restrictions were imposed because of the COVID-19 pandemic. The travel restrictions also prevented any other travel plans to Chile for the Rainbow gathering. By the time the travel restrictions were lifted the parties' relationship had deteriorated even further and Petitioner would not agree to allow the child to leave the country. Petitioner testified he was scared Respondent would take the child and not return. After the romantic relationship between the parties ended, Respondent contends she was effectively stuck in Argentina. Respondent developed a romantic relationship with another individual in Argentina and cohabitated with that person for a short period of time.

Petitioner would not voluntarily agree for Respondent to travel to the United States with the child. As a result, Respondent eventually petitioned the Argentina courts for permission to travel with the child. After filing the petition, the parties mediated their dispute with a court mediator. As a result of the mediation, the parties agreed to Respondent being granted permission to travel to the United States with the child. The agreement, approved by the Argentina court, allowed for Respondent to travel to the United States for 40 days over the Christmas holidays and then to return to Argentina with the child at the end of that time period. Respondent also provided assurances to Petitioner and Petitioner's family that she would return. At the time of this trip the child was 22 months old.

Respondent traveled to the United States pursuant to the agreement between the parties that was authorized by the Argentina court. However, she did not, and has not, returned to Argentina as required by that court approved agreement and order. Respondent has reunited with her family in the United States and has obtained full-time employment at Missouri State University. Petitioner has maintained periodic contact with the child via zoom but has had no in person visits with his child. Petitioner cannot legally enter the United States at this time.

## DISCUSSION

The Hague Convention provides for the return of children who were "wrongfully removed or retained" away from their "habitual residence." 22 U.S.C. § 9001(a)(4); *Barzilay v. Barzilay*, 600 F.3d 912, 916–17 (8th Cir. 2010). As noted by the Eighth Circuit, "[t]he key inquiry under the Convention is whether a child has been wrongfully removed from the country of its habitual residence or wrongfully retained in a country other than that of its habitual residence." *Barzilay v. Barzilay*, 600 F.3d at 917; citing *Barzilay v. Barzilay*, 536 F.3d 844, 847 (8th Cir. 2008). In order to prevail on a Petition to Return a Child filed under the provisions of the Hague Convention, a Petitioner has the burden to prove, by preponderance of the evidence, that the child has been "wrongfully removed or retained" from the child's "habitual residence." *Id.*

The initial question presented to the Court is whether the minor child was a "habitual resident" of Argentina when Respondent removed the child to the United States. The purpose of the habitual residence requirement aligns with a core premise of the Hague Convention: that custody be litigated in the country that will best serve the interests of—and protect—the child. Whether a country is the child's habitual residence is based on a "common sense" evaluation of the "totality of the circumstances" of each case. *Monasky v. Taglieri*, 589 U.S. 68 (2020). No one

5

Case 6:23-cv-03022-MDH   Document 103   Filed 06/25/24   Page 5 of 10

factor is determinative and the mere fact of a child's birth in a country is insufficient as a matter of law. *Id*. at 81.

The Hague Convention does not define the term "habitual residence." *Id.* at 76–77, 81. The determination of "habitual residence depends on the specific circumstances of the particular case." *Id.* at 78. The issue for the Court is a "fact-driven inquiry" and the Hague Convention gives courts "maximum flexibility" to act based on the precise scenario before it, "informed by common sense." *Id*. at 78– 79. If a child is "too young or otherwise unable to acclimate," courts may consider "the intentions and circumstances of caregiving parents." *Id*. The Supreme Court has stated that the Court should use "common sense" in determining, based on the "totality of the circumstances," whether a country is a child's "habitual residence" and that the "aim [is] to ensure that custody is adjudicated in what is presumptively the most appropriate forum—the country where the child is at home." *Id.* at 78–79.

Respondent cites *Delvoye v. Lee*, 329 F.3d 330 (3d Cir. 2003) as analogous. There, the Third Circuit upheld the district court's finding that the child's habitual residence was not Belgium, where the parents traveled to Belgium to have the baby and only planned to live there temporarily. *Id*. Respondent argues here, but for the unforeseen circumstances of the COVID-19 pandemic, the parties would not have stayed in Argentina. They only intended to stay to have the birth of the child and then to travel to the next Rainbow gathering after the child was born.

Respondent also cites to cases where courts have declined to find habitual residence in a country where "the removing spouse is coerced involuntarily to move to or remain" there. Citing, *Silverman v. Silverman*, 338 F.3d 886, 900 (8th Cir. 2003); *Monasky*, 589 U.S. at 78 (stating courts should consider if a "caregiving parent had been coerced into remaining" in the country); *Sain ex rel. V.R.S. v. Sain*, 548 F. Supp. 3d 1181, 1183, 1190–93 (M.D. Fla. 2021). However, in this

6

Case 6:23-cv-03022-MDH   Document 103   Filed 06/25/24   Page 6 of 10

particular factual scenario there is no evidence that Petitioner coerced or used deceit to move Respondent to Argentina or to keep her and the child in a foreign country. Here, the move to Argentina for the birth of the child was a choice, albeit one based on limited options given the parties' status and Petitioner's past. The decision to remain was driven by COVID-19 restrictions and the deterioration of the parties' relationship. While Respondent makes allegations of physical violence, the evidence overwhelmingly supports that the parties were prevented from any travel by the COVID-19 restrictions, not specially Petitioner's alleged threats or coercions.

In *B.E. v. T.C.*, the court considered COVID-19 travel restrictions when evaluating whether England became the child's habitual residence while he was living there with petitioner from 2019 to 2021. *State ex rel. B.E. v. T.C.*, 164 N.Y.S.3d 374, 379 (N.Y. Sup. Ct. 2022). The court found England was not the child's habitual residence because, although he remained there for the majority of the pandemic, the parents had not intended for England to be the child's home. *Id*.

In *Nisbet v. Bridger*, 2023 WL 6998081, at *12 (D. Or. Oct. 24, 2023) a district court found that the Petitioner failed to meet the burden of establishing a habitual residence and as a result the children lacked a habitual residence. In *Nisbet,* the respondent moved to Scotland to give birth to her second child. *Id*. In its findings of fact, the district court noted that the U.S. consulate closed due to the COVID-19 pandemic before the Respondent was able to make an appointment to apply for the child's passport and other necessary paperwork to establish U.S. citizenship.[3]

Here, Respondent argues there is no burden to prove, and no need for the Court to determine, an alternative habitual residence if it is not Argentina. Citing *Pope v. Lunday*, 835 F.

---

[3] The court's determination in *Nisbet* also involves a finding that there was a grave risk of harm and intolerable situation to the children that Respondent had proven by clear and convincing evidence. There is no evidence of such harm in this case.

App'x 968, 971 (10th Cir. 2020); and *Watts v. Watts*, 935 F.3d 1138, 1147–48 (10th Cir. 2019). Petitioner contends the only place of habitual residence under this circumstance is Argentina.

This case, like most all cases presented under the Hague Convention, presents extremely difficult situations for all the parties involved. The facts of the case present the unique scenario of the parties' nomadic lifestyles and the world-wide travel restrictions imposed by the COVID-19 pandemic. Further, regardless of the Court's decision there is still an emotional and difficult custody battle between the parties – which is not an issue for this Court to determine – but that will affect all the parties involved, including the minor child.

With this background, the Court must consider the fact intensive question of "habitual residence" and reach a decision based on the totality of the circumstances. The Court has taken into consideration the totality of the circumstances in reaching its decision. Here, the case presents a circumstance where the minor child was extremely young and so the Court looks to the intentions and circumstances of the parents.

The case law is clear that birthplace alone does not establish habitual residence. Further, the parties chose Argentina, in part, because their other choices were not available based on Petitioner's restrictions on entering certain countries. Further, neither parent had been living in Argentina until the eve of the child's birth. Petitioner had left Argentina many years earlier and spent little time there since leaving. Respondent had never been to Argentina prior to moving for the birth.

The Court finds the testimony, from both parties, reflect the parties' clear intention to travel again resuming their nomadic lifestyle after the child was born. This is consistent with their prior lifestyle in which they traveled to Rainbow gatherings and did not appear to settle in one place. Specifically, both parties testified regarding their intentions to travel to Chile shortly after the

child's birth. Respondent testified the parties had no intention of remaining in Argentina or raising the child in Argentina. The Court finds that but for the COVID-19 travel restrictions the parties would not have remained in Argentina. Petitioner testified Argentina was going to be their "home base." The Court finds this less likely based on the facts presented and there is no evidence the parties ever agreed to make Argentina their home.

Therefore, the Court must determine whether a finding of a habitual residence is required. If the Hague Convention requires every child to have a habitual residence the only obvious choice in this instance would be Argentina as the child had no other habitual residence prior to Respondent removing the child to the United States. However, the Court does not believe Petitioner has met his burden to establish a habitual residence. The record does not support that the parties' intended to stay in Argentina. Rather, the parties clearly intended to begin travel toward Chile for the next Rainbow gathering shortly after the child was born.

Neither party appears before this Court with clean hands. Petitioner was physically abusive to the Respondent, failed to attend his child's first Christmas, and initially refused to cooperate in obtaining travel documents for the child. Further, his past illegal entry to the United States limited the parties' options for the birth of the child. On the other hand, Respondent acted in clear violation of an order of the Argentinian court by not returning the child to Argentina after the approved period. She arguably had no alternative but to seek permission from the Argentina courts given Petitioner's refusal to allow her to leave Argentina with the child. However, under these circumstances the Argentina court order, following mediation of the parties, does not conclusively establish habitual residence.

It is obvious the child will suffer regardless of this Court's decision if the parties can't cooperate with one another and place the best interest of their child above their own. The actual

custodial and visitation rights of the parties regarding the child however are not this Court's task. Here, the Court finds Petitioner has failed to establish that Argentina was the habitual residence of the child. The Court has balanced the unusual circumstances which led the parties to Argentina, the travel limitations and the circumstances which caused them to stay in Argentina, and the parties' prior intentions to travel after the child's birth against the Argentina court order that Respondent blatantly violated. The Court certainly does not condone Respondent's behavior but finds that in this circumstance the parties did not intend for Argentina to be the habitual residence of the child.

## DECISION

Wherefore, based on the record before the Court, the Court finds Argentina was not the habitual residence of the child. As a result, Petitioner's Petition for Return of Child is denied. The Court finds the child was not removed from the habitual residence and the case is hereby dismissed.

**IT IS SO ORDERED.**

Date: June 25, 2024

> */s/ Douglas Harpool*
> **DOUGLAS HARPOOL**
> **UNITED STATES DISTRICT JUDGE**